2024 IL App (1st) 221102-U
No. 1-22-1102

FIRST DIVISION
March 11, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| MELISSA KAY, on behalf of herself and a class of all others similarly situated, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois, Chancery Division |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 2019 CH 12160 |
| DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, as surety of the Illinois Treasurer, | ) ) ) ) | The Honorable Pamela McLean Meyerson, |
| Defendant-Appellant. | ) ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We answer the circuit court's certified questions as follows: (1) The Illinois General Assembly did not waive sovereign immunity to allow a participant in the College Savings Pool to initiate an action in the circuit court against the surety on the bond posted pursuant to section 16.5(o) of the College Savings Pool Act, 15 ILCS 505/16.5(o); and (2) The College Savings Pool Act did not create a private right of action allowing individual participants in the College Savings Pool to have standing to pursue an action to recover from the bond.

¶ 2    This appeal stems from a putative class action suit brought by participants in Illinois'

College Savings Pool against Defendant-Appellant Department of Central Management Services

(CMS) as surety of the Illinois Treasurer on the bond required pursuant to the College Savings Pool Act. Plaintiff-Appellee Melissa Kay sued on behalf of herself and the putative class, alleging that the Treasurer improperly managed the College Savings Pool by retaining excessive sums of administrative fees and unevenly assessing fees against the pool participants. Following the circuit court's rejection of CMS's motion to dismiss, the court granted CMS's motion to certify two questions for interlocutory appeal pursuant to Ill. Sup. Ct. R. 308. We allowed the appeal of the following issues: 1) whether the Illinois legislature waived sovereign immunity to allow participants in the College Savings Pool to sue the surety on the bond posted pursuant to section 16.5(o) of the College Savings Pool Act; and 2) whether the College Savings Pool Act created a private right of action for participants to have standing to sue on the bond.

¶ 3                                    BACKGROUND

¶ 4                          The College Savings Pool

¶ 5     In 1996, to address the rising costs of higher education, Congress authorized the states to create "qualified tuition plans," also known as 529 plans. These plans allowed individuals to make contributions to investment accounts to save for college, and the gains on these investments were exempt from federal and state taxes. In 2000, the Illinois legislature passed section 16.5 of the State Treasurer Act (Act). Pub. Act 91-607, § 5 (eff. Jan. 1, 2000) (adding 15 ILCS 505/16.5).[1]

¶ 6     Under section 16.5, the General Assembly created the College Savings Pool (Pool), which operated as Illinois' 529 plan. The State Treasurer was given the authority to establish and administer one or more college savings programs, which would collectively comprise the Pool. In administering the Pool, the Treasurer "may receive, hold, and invest moneys paid into the Pool and perform such other actions as are necessary to ensure that the Pool operates as a qualified

---

[1] This section of the State Treasurer Act is also referred to as the College Savings Pool Act.

tuition program." 15 ILCS 505/16.5(b) (West 2022). The Treasurer established two college savings programs that together constitute the Pool: Bright Start and Bright Directions. Both programs are trusts, with the Treasurer serving as the trustee.

¶ 7    The Act further requires that the Treasurer "shall give bond with at least one surety, payable to and for the benefit of the account owners in the College Savings Pool, in the penal sum of $10,000,000, conditioned upon the faithful discharge of his or her duties in relation to the College Savings Pool." 15 ILCS 505/16.5(o). Pursuant to the Official Bond Act (Bond Act), CMS is the surety on the above-mentioned bond. *See* 5 ILCS 260/14.1 ("Wherever State officers *** are required by law *** to obtain a fidelity or surety bond ***, the bonding requirement shall be satisfied by a blanket bond or bonds contracted for *** by the Department of Central Management Services.")

¶ 8                              Original Action

¶ 9    Plaintiff-Appellee Kay has been a Bright Start participant since 2018. February 16, 2018, she filed a putative class action suit against the State Treasurer in his official capacity, alleging that he violated the Act and its related regulations through improperly managing the Pool. *See Kay v. Frerichs*, 2021 IL App (1st) 192271, ¶ 5. She specifically alleged that the Treasurer illegally charged fees based off of the Pool's assets rather than its earnings, illegally retained excess administrative fees that should have been returned to the participants, and illegally exempted some funds from administrative fees while charging other funds more than their share. *Id.* She sought various damages and injunctive relief.

¶ 10    The Treasurer moved for summary determination of a major issue, arguing that sovereign immunity barred Kay's claim for monetary damages, because she sought money that would come from the State Treasury. Kay responded that sovereign immunity did not apply because the

monetary damages she was seeking would not come from state funds, but from an account specifically established to pay the Pool's operational expenses, known as Trust Fund No. 668[2] (Trust 668), and the statutorily-required bond.

¶ 11    The circuit court granted the Treasurer's motion, holding that sovereign immunity barred Kay from seeking any recovery other than prospective injunctive relief. The court rejected her argument that her recovery would come fees from the Pool's participants' accounts rather than the State's general revenue fund. Rather, the court found that Trust 668 did contain state funds, and that it was not set up for the purpose of paying claims like those bought by Kay. Furthermore, pursuant to the Act, the Treasurer was given the discretion to establish Trust 668 for the purpose of receiving administrative fees that were charged and collected from the Pool. Therefore, according to the circuit court, a large withdrawal from the trust—as might occur if the court ruled in Kay's favor—could interfere with the State's discretion in determining the appropriate level of reserves in accord with fiscally responsible practices. *See Kay*, 2021 IL App (1st) 192271 at ¶ 10.

¶ 12    While Kay's action was pending, the legislature amended section 16.5 of the Act to explicitly allow the Treasurer to collect administrative fees from the assets of the Pool. *See* Pub. Act 100-905, § 5 (eff. Aug. 17, 2018); Pub. Act 101-26, § 5 (eff. June 21, 2019). Kay conceded that these amendments rendered her claims for injunctive relief moot. Because she could no longer pursue her claims for either monetary or injunctive relief—in light of the Treasurer's sovereign immunity defense and the amendments to the Act, respectively—the circuit court entered a final judgment disposing of the entire suit. Kay then filed an appeal of the circuit court's ruling in favor of the Treasurer on his summary judgment motion. Around the same time, she also commenced a new suit against CMS, discussed further below.

---

[2] According to Kay's response, the money in this trust came exclusively from participants in the Pool.

¶ 13                                        First Appeal

¶ 14    On appeal, Kay argued that the circuit court erred in determining that the funds in Trust 668 were state funds and that sovereign immunity therefore applied to bar her claims. She again raised her allegations that these were private funds, "'illegally taken from participants and held in a segregated account' from the general revenue fund." *Kay*, 2021 IL App (1st) 192271, ¶ 17.[3] On May 28, 2021, we issued an opinion affirming the circuit court. *Id.* at ¶ 24.

¶ 15    We found that, despite Kay's allegations that the Treasurer acted outside of his authority, her claims exclusively related to the Treasurer's administration of the Pool's finances, a duty which he is authorized to perform in his official capacity pursuant to the Act. *Id*. at ¶ 21. We further affirmed the circuit court's finding that "any damages awarded in this matter would be taken from Trust 668, which would control how the Treasurer manages the remaining funds and, in turn, control the actions of the State." *Id*. at ¶ 22. Therefore, her claims fell within the "precise circumstances for which the sovereign immunity doctrine is designed." *Id*. at ¶ 21.

¶ 16                                       Second Action

¶ 17    On October 21, 2019, Kay filed an action in the circuit court against CMS, "as surety of the Illinois Treasurer." Her complaint raised the same claims previously brought against the Treasurer, adding that, under section 13 of the Bond Act, she was able to bring a direct action against the surety of the College Savings Pool bond. *See* 5 ILCS 260/13 ("Whenever the condition of the bond of any public officer is violated, action may be instituted on the bond, and prosecuted to final judgment against the officer, and any or all of the sureties ***.") She sought relief in the form of monetary damages; specifically, she asked that the Treasurer return the allegedly illegally-

_____

[3] She also challenged the circuit court's dismissal of her *mandamus* action asking the court to compel the Treasurer to return the fees to participants. On appeal, we agreed with the circuit court that the extraordinary remedy of *mandamus* was not appropriate in this matter, where the court would override the discretion of the Treasurer in managing the Pool.

withheld excess fees and any earnings that would have accrued on those amounts, and she requested damages incurred due to the Treasurer's allegedly assessing fees unequally among the Pool funds.

¶ 18    CMS filed a combined motion to dismiss, arguing: 1) that the complaint failed to state a claim; 2) that Kay, as a private citizen, lacked standing to bring an action on a statutorily mandated public official bond; and 3) that her claims were barred by sovereign immunity for similar reasons raised by the Treasurer in Kay's prior suit. On February 2, 2022, following a hearing, the circuit court denied CMS's motion in an oral ruling. The court found that Kay had sufficiently pled her claims to survive a section 615 motion to dismiss.

¶ 19    Turning next to the two affirmative defenses, the circuit court ruled that Kay and the putative class of account holders had standing to bring their suit against CMS pursuant to the holding in *Bueker v. Madison County*, 2016 IL 120024. The court explained that although the Treasurer is the obligee on the bond, the Act specifically states that the bond must be payable to and for the benefit of the account holders. Therefore, Kay and the putative class of participants in the Pool had standing to bring an action on the bond because the legislature indicated an intent to allow account holders to do so under the Act.

¶ 20    Regarding CMS's second affirmative defense, the circuit court also rejected the argument that Kay's claims were barred by sovereign immunity. It found that a judgment against CMS in this case would not improperly control the actions of or impose liability on the State. The court also agreed with Kay's argument that the State had waived sovereign immunity on the bond "by providing in the Bond Act that actions on official bonds are to be brought in the circuit court and not in the court of claims." Furthermore, the court noted that while the Treasurer was allowed to satisfy the statutory bond requirement by obtaining it from CMS (as he did here), he equally could

have chosen a third-party surety instead; in the latter option, there would be no potential sovereign immunity argument. The circuit court stated that an account holder's ability to recover on the bond should not depend on the bond's issuer.

¶ 21                                     Present Appeal

¶ 22    Following the circuit court's ruling on its motion to dismiss, CMS filed its Motion to Certify Questions for Appeal and Motion to Stay. On July 6, 2022, the court granted both motions and certified the following two questions for interlocutory appeal:

1.   Did the Illinois General Assembly waive sovereign immunity to allow a participant in the College Savings Pool to initiate an action in the circuit court against the surety on the bond posted pursuant to section 16.5(o) of the College Savings Pool Act, 15 ILCS 505/16.5(o) (2020)?

2.   Does the College Savings Pool Act create a private right of action allowing individual participants in the College Savings Pool to have standing to pursue an action to recover from the bond?

¶ 23    We granted CMS's petition for leave to appeal the two certified questions on August 22, 2022.[4]

¶ 24                                      ANALYSIS

¶ 25                                  Standard of Review

¶ 26    Illinois Supreme Court Rule 308 allows for the appeal of interlocutory orders "where the trial court has deemed that they involve a question of law as to which there is substantial ground for difference of opinion and where an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Dartt v. Pegman*, 2022 IL App (1st) 210633, ¶ 11 (quoting *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 398 Ill. App. 3d 773, 778 (1st Dist. 2009)); *see also* Ill. S. Ct. R. 308(a) (eff. Oct. 1, 2019). The standard of review for legal

---

[4] While the circuit court addressed CMS's standing and sovereign immunity arguments in the order discussed here, we will proceed with the certified questions in the order in which they were listed in the circuit court's ruling, turning first to the question of sovereign immunity and next to the issue of standing.

questions presented on interlocutory appeal pursuant to Rule 308(a) is *de novo*. *Dartt*, 2022 IL App (1st) 210633 at ¶ 11. Our review is strictly limited to the certified questions; we do not render any opinion on any of the trial court's underlying rulings. *Id*. (quoting *Apollo* 398 Ill. App. 3d at 778).

¶ 27     Both certified questions pose the issue of statutory construction. The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 13. "The best indication of legislative intent is the language used in the statute, which must be given its plain and ordinary meaning." *Id.* (citing *Gillespie Community Unit School District No. 7 v. Wight & Co.*, 2014 IL 115330, ¶ 31). If the statutory language is clear on its face, the court should not resort to other aids of construction. *Id.* The court cannot depart from the plain language of the statute by reading into it any exceptions, limitations, or conditions that conflict with the clearly-expressed legislative intent. *Id*. (citing *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 18). Each word, clause, and sentence of the statute must be given a reasonable construction, and no term should be rendered superfluous. *Id*. (citing *Prazen v. Shoop*, 2013 IL 115035, ¶ 21). When reviewing a matter of statutory interpretation, we presume that the legislature passed the statute "with full knowledge of all existing and prior statutory and case law." *People v. Johnson*, 2019 IL 123318, ¶ 42.

¶ 28                      Whether the Legislature Waived Sovereign Immunity

¶ 29 Before rendering its ruling on CMS's sovereign immunity argument, the circuit court stated that while this defense barred Kay's suit against the Treasurer in *Kay v. Frerichs*, it did not automatically follow that this would apply to the suit against CMS as well. The circuit court had previously determined—and we affirmed on appeal—that the recovery Kay sought against the Treasurer from Trust 668 would draw from state funds, and could control how the Treasurer

manages the remaining funds. However, turning to Kay's present suit, the court noted that the Treasurer was not required to use a self-insured state agency like CMS as surety, and could have selected a private third-party surety instead. Therefore, Pool participants' right to sue on the bond could hinge on the Treasurer's decision. According to the circuit court, this should not be the case—"an account holder's ability to recover should not depend on who issued the bond." The court further asserted that "the bond would be elusory [*sic*] if CMS could say, 'We're an arm of the state, and you can't control the state by filing a claim on the bond.'" The court further stated that it agreed with Kay's argument that the State waived sovereign immunity on the bond by stating in the Bond Act that actions on official bonds are to be brought in the circuit court rather than the court of claims.

¶ 30    On appeal, the issue of sovereign immunity is limited to the question of whether the General Assembly waived sovereign immunity. Therefore, we need not consider CMS's prior arguments on its motion to dismiss regarding whether a judgment against CMS would impose liability on and constrain the actions of the Treasurer. CMS's argument before the circuit court and on appeal is that neither the College Savings Pool Act nor the Bond Act contain clear and explicit language waiving sovereign immunity; therefore, there is no statutory support for the position that the General Assembly intended to subject the State to liability.

¶ 31    Sovereign immunity is codified in the State Lawsuit Immunity Act (Immunity Act), which states that, except as provided in the Court of Claims Act and other listed statutes, "the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2022); *see also Watkins v. Office of State Appellate Defender*, 2012 IL App (1st) 111756, ¶ 21. The Court of Claims Act, 705 ILCS 505/1 *et seq.*, states that, with limited exceptions, the Court of Claims has exclusive jurisdiction over all claims against the State "founded upon any law of the State of

Illinois," "founded upon any contract entered into with the State of Illinois," and certain other enumerated matters. 705 ILCS 505/8 (West 2022).

¶ 32    The General Assembly may consent to the liability of the State by waiving sovereign immunity via statute. *See Parmar v. Madigan*, 2018 IL 122265, ¶ 31. Waiver of sovereign immunity must be clear and unequivocal, explicitly indicating through affirmative language the legislature's specific authorization of waiver. *Id.*; *see also Watkins*, 2012 IL App (1st) 111756 at ¶ 23. In our review of whether the State has waived sovereign immunity, "the critical issue is whether the legislature intended to impose liability upon the State, not how or where the intent is expressed." *Grey v. Hasbrouck*, 2015 IL App (1st) 130267, ¶ 18 (quoting *Martin v. Giordano*, 115 Ill.App.3d 367, 370 (4th Dist. 1983)).

¶ 33    Examples where our courts have found that the legislature intended to waive sovereign immunity include sections 19 and 25 of the Illinois Educational Labor Relations Act (115 ILCS 5/19 (West 2022)) and the Illinois Public Labor Relations Act (5 ILCS 315/1, *et* (West 2022)), respectively, both of which state: "For purposes of this Act, the State of Illinois waives sovereign immunity." *See also Parmar*, 2018 IL 122265 at ¶ 31 (discussing the Illinois Educational Labor Relations Act); *Leetaru v. Board of Trustees of University of Illinois*, 2015 IL 117485, ¶ 74 (discussing the Illinois Public Labor Relations Act).

¶ 34    However, not all expressions of waiver must adhere to this phrasing—we found that the legislature intended to waive sovereign immunity in section 5 of the Illinois Civil Rights Act of 2003 (Civil Rights Act) (740 ILCS 23/5 (West 2022)), and that the legislature's consent extended to the obligation of paying attorney fees and costs as listed in section 5(c). *See Grey*, 2015 IL App (1st) 130267, ¶¶ 18-21. The parties in *Grey* agreed that the Civil Rights Act specifically subjected the State to claims brought under this statute. *See* 740 ILCS 23/5(b) ("Any party aggrieved by

conduct that violates subsection (a) may bring a civil lawsuit, in a federal district court or State circuit court, against the offending unit of government.") We held that the language stating, "Upon motion, a court shall award reasonable attorneys' fees and costs *** to a plaintiff who is a prevailing party ***" (740 ILCS 23/5(c)) was sufficiently clear and explicit to permit such an award against the State when read within the context of section 5 as a whole, and the legislature did not intend to exempt the State from paying attorney fees and costs by not including a specific reference to the State in section 5(c). *Grey*, 2015 IL App (1st) 130267, ¶¶ 20-21.

¶ 35    Conversely, there are various examples of our courts rejecting the waiver argument. Our supreme court found that section 2-1303 of the Code of Civil Procedure, 735 ILCS 5/2-1303, did not contain waiver where it provided for a 6% interest rate on judgments when the judgment debtor is "a unit of local government, *** a school district, a community college district, or any other governmental entity." *In re Walker*, 131 Ill.2d 300, 303 (1989) (finding that the language "or any other government entity" was not a sufficiently clear expression of waiver).

¶ 36    The legislature also did not waive sovereign immunity in its 2008 amendments to the Illinois Human Rights Act (775 ILCS 5/Art. I *et seq*. (West 2022)) by allowing complainants to seek review by filing a civil action in the circuit court, where, prior to the amendments, review was only available before the Human Rights Commission. *See Watkins*, 2012 IL App (1st) 111756 at ¶ 23 (finding that there was no affirmative language in the Human Rights Act which stated that the State waived its immunity). In a later decision also rejecting the argument that the 2008 amendments waived sovereign immunity, the Fourth District explained that the language of the amendments was too ambiguous to indicate waiver, because it could either be read to mean that a complainant could choose between seeking review before the Commission or the circuit court, or be read to mean that a complainant may commence an action in the circuit court if that is an

appropriate forum (*i.e.*, when sovereign immunity does not apply.) *See Lynch v. Department of Transportation*, 2012 IL App (4th) 111040, ¶ 30.

¶ 37 On appeal, CMS argues that the circuit court erred in inferring a waiver of sovereign immunity in sections 13 and 14 of the Bond Act for four reasons. The first is that the Bond Act actually makes it clear that the legislature did not intend to waive sovereign immunity. CMS references section 14.1, which, as previously discussed, states that when a state officer is required to obtain a surety bond, that requirement may be satisfied through a self-insurance program established by CMS—which the Treasurer chose here. The Department of Central Management Law provides that "[a]ny claims against the State of Illinois under a self-insurance plan *** shall be heard and determined by the Court of Claims and may not be filed or adjudicated in any other forum." 20 ILCS 40/405-105(11) (West 2022). This, as CMS further contends, clearly shows that sovereign immunity applies to suits seeking to hold CMS liable for the Treasurer's alleged mismanagement of the Pool.

¶ 38 CMS's second argument is that our courts have declined to find waiver in statutory language that generally refers to the circuit court, similar to sections 13 and 14 of the Bond Act. Specifically, in *Parmar*, our supreme court found that the legislature did not waive sovereign immunity in the jurisdiction and venue provisions of the Illinois Estate and Generation-Skipping Transfer Tax Act by mentioning the circuit court, as follows:

> "(a) Jurisdiction. Jurisdiction to hear and determine all disputes in relation to a tax arising under this Act shall be in the circuit court for the county having venue as determined under subsection (b) of this Section, and the circuit court first acquiring jurisdiction shall retain jurisdiction to the exclusion of every other circuit court.
>
> (b) Venue. (1) Venue for disputes involving Illinois estate tax of a decedent who was a resident of Illinois at the time of death shall lie in the circuit court for the county in which the decedent resided at death." *Parmar*, 2018 IL 122265 at ¶ 29 (quoting 35 ILCS 405/15 (West 2014)).

The court explained that this language was not a clear and unequivocal waiver of sovereign immunity, despite referring to the circuit court having jurisdiction to hear all tax disputes under the act, because "it does not reference the State or its immunity." *Id.* at ¶ 32. Elaborating further, the court stated that statutes which "use only general terms without an expressed intent to subject the State to liability will not be construed to impair or negate the State's immunity from suit established in the State Lawsuit Immunity Act." *Id.* CMS also cites to the decisions in *Watkins* and *Lynch*, discussed above, which made similar findings regarding the 2008 amendments to the Illinois Human Rights Act. Arguing further, CMS notes that the Bond Act does not even mention the circuit court, making it an even clearer example than the two statutory examples provided.

¶ 39    Its third point is that the Bond Act does not create a public right of action, and therefore cannot be construed as a clear expression of the legislature's intent to waive sovereign immunity. *See Hicks v. Aetna Ins. Co.*, 97 Ill. App. 3d 828, 831 (5th Dist. 1981) ("Neither the general laws governing the Department of Agriculture nor the Grain Dealers Act specifically authorize suit by a private party on the Department of Agriculture's performance bond") (internal citations omitted.) In *Hicks*, the Fifth District further noted that while there have been several cases that allowed for recovery on a public official's performance bond, none involved suits brought by private parties; this tracks with the longstanding rule that "a third party may not bring an action on an official bond in the absence of specific authority." *Id.* (citing 63 Am. Jur. 2d, *Public Officers and Employees*, § 463 (1972)); *see also Bueker*, 2016 IL 120024 at ¶ 10 ("The proper claimant on a statutory public official bond is the named obligee, unless the legislature has expressed in the statutory language its intent to allow others to sue directly on the bond.")

¶ 40    Fourth, CMS contends that a finding of waiver here would create a "significant exception" to the Immunity Act that is not present in the plain text, because the Bond Act applies to "[a]ll

official bonds required by law to be given by any public officer or public employee." 5 ILCS 260/1 (West 2022). In support, CMS argues that a finding of waiver in the Bond Act would mean that the General Assembly intended to subject numerous state officers and employees to liability in the circuit court, as there are several other laws in addition to the College Pool Savings Act that require public officers to post a bond. Relatedly, CMS notes that the Immunity Act does not include the Bond Act in its list of statutes that provide for exceptions to sovereign immunity, despite the fact that in 1972, when the General Assembly codified sovereign immunity, the Bond Act contained the same provisions that supposedly waive sovereign immunity and allow Kay to pursue her claims in the underlying matter. Therefore, the fact that the General Assembly did not include the Bond Act as an exception to the rule that "the State of Illinois shall not be made a defendant or party in any court" is further indication that it did not intend to carve out an exception allowing suits on official bonds.

¶ 41　　Additionally, CMS addresses the circuit court's concern that the bond would be illusory if beneficiaries could not sue on the bond. It contends that, if the Treasurer failed to faithfully discharge his duties as to the Pool, the Illinois Attorney General could bring an action against him in the circuit court to collect on the bond for the benefit of the Pool participants. Such an action would not be barred by sovereign immunity. *See* 15 ILCS 205/4 (West 2022) (Duties of the Attorney General include "institute[ing] and prosecut[ing] all actions and proceedings in favor of or for the use of the State, *** enforc[ing] the proper application of funds appropriated to the public institutions of the State, [and] prosecut[ing] breaches of trust in the administration of such funds.") Kay also could have commenced an action against the Treasurer in the Court of Claims, as we explained in the appeal of her first action. *See Kay*, 2021 IL App (1st) 192271 at ¶ 23.

¶ 42    In response, Kay alleges that the legislature waived sovereign immunity and consented to lawsuits on the bond in three separate statutes—the College Savings Pool Act, the Official Bond Act, and the Official Bond Payment Act (Payment Act). According to Kay, the College Savings Pool Act includes affirmative language waiving sovereign immunity by making account holders the beneficiaries of the bond that the Treasurer is required to post, stating that the "Treasurer shall give bond with at least one surety, payable to and for the benefit of the account owners in the College Savings Pool." 15 ILCS 16.5(o). Kay argues that the legislature specifically chose language making the official bond for the benefit of, and payable to, the individual account holders rather than to the "People of the State of Illinois," as it had in the Counties Code and Property Tax Code discussed in *Bueker*. *See Bueker*, 2016 IL 120024, ¶ 17 ("We find nothing, either expressly or by implication, in section 3–10003 of the Counties Code or section 19–40 of the Property Tax Code indicating a legislative intent that private citizens may sue for damages on the public official bond running only to 'the People of the State of Illinois' as obligee.")

¶ 43    Kay further argues that whenever a statute provides that the State will pay for something, the legislature has indicated a waiver of sovereign immunity. One such alleged example that she cites to in support of this argument is *Martin v. Giordano*, 115 Ill.App.3d 367 (4th Dist. 1983). In that decision, the Fourth District found that the State waived immunity from a section of the Workers' Compensation Act authorizing additional payment for vexatious and unreasonable delay in payment of a claim because various statutory provisions indicated the submission of the State to liability; for example, section 2 of this act states that "[t]he State of Illinois hereby elects to provide and pay compensation according to the provisions of this Act." *Id.* at 369-70.

¶ 44    In the Bond Act, Kay specifically points to section 13 of the Bond Act, which states:

"Whenever the condition of the bond of any public officer is violated, action may be instituted on the bond, and prosecuted to final judgment against the officer, and any or all

- 15 -

of the sureties, or against one or more of them, jointly and severally, without first establishing the liability of the principal by obtaining judgment against him or her alone." 5 ILCS 260/13.[5]

Her reasoning is that the inclusion of language such as "prosecuted to final judgment" and "by obtaining judgment" indicates the legislature's intent to allow actions on official bonds to proceed in the circuit court as a way to protect account holders, and any reading to the contrary would render this bond meaningless and thwart the legislature's mandate. Kay further explains that the only courts that can render "judgments" are Article VI courts, like the circuit court, whereas the Court of Claims enters "awards." *See* Ill. Const., Art. VI, § 6; 735 ILCS 5/2-1301 *et seq.*; *compare* 705 ILCS 505/26.

¶ 45     She notes the distinction between judgments and awards, with the former being enforceable, appealable, and subject to a 9% statutory interest rate until satisfied, while the latter are not. *See*, *e.g.,* 705 ILCS 505/17 ("Any final determination against the claimant on any claim prosecuted as provided in this Act shall forever bar any further claim in the court arising out of the rejected claim"); *Lucky Stores, Inc. v. State*, 47 Ill. Ct. Cl. 440, 441 (1994) ("[T]here is no statute expressly subjecting the State to liability for interest on Court of Claims awards"); *State Employees' Retirement System v. State*, 37 Ill. Ct. Cl. 288, 290 (1984) (where General Assembly did not appropriate sufficient funds to cover claimant's claim, the claim was denied).

¶ 46     Kay additionally argues that the language of the Bond Act evinces the legislature's intent to waive immunity by the fact that it applies only to State officers and employees. *See* 5/ILCS 260/1 ("All official bonds required by law to be given by any public officer or public employee *** shall be signed by that officer or employee ***.") The entire act also deals exclusively with

---

[5] She also cites to section 14 for additional language regarding judgments on official bonds: "Enforcement may be had *on any judgment* so entered as in other civil cases ***; however, *the judgment* shall be a lien upon the property of the sureties as in other civil cases." 5 ILCS 260/14.

public official bonds. Therefore, she continues, the legislature contemplated the possibility that public funds would be at issue, yet still "made it clear that it expected the property of the surety, which is an arm of the State itself, to be subject to judicial enforcement."

¶ 47     She finds further support in section 14.5 of the Bond Act, which states, in pertinent part, "Claims *** of a self-insurance program shall be paid on a pro rata and per occurrence basis out of appropriate funds of the self-insurance agency." 5 ILCS 260/14.5 (West 2022). She concludes that this undoubtedly signals the legislature's intent that the funds of the agency—whether it be CMS or the Treasurer—be available as a remedy for a breach of the public trust.

¶ 48     She also cites to the Payment Act for additional language, similar to the above, stating that the State is required to pay on an official bond:

> "The State *** shall pay out of its funds the cost of any official bond furnished by any officer of the State *** required by its laws, rules, or regulations to execute the bond if the officer furnishes the bond with a surety company or companies authorized to do business in this State under the laws of this State and, if the surety on any official bond is not such a surety company or companies, the State *** shall pay out of its funds the cost of any bond or bonds indemnifying the surety against liability on the official bond." 5 ILCS 270/1.

Kay concludes that the combined examples from the abovementioned three acts indicate through clear and unequivocal language that the legislature intended to waive sovereign immunity and to allow judgments on the bond in question to be available and enforceable "as in other civil cases" (5 ILCS 260/14) and that the State "shall pay out of its funds the cost of any bond or bonds indemnifying the surety against liability on the official bond" (5 ILCS 270/1); furthermore, Pool participants are the beneficiaries and payees of that bond. *See* 15 ILCS 505/16.5(o).

¶ 49     Kay further distinguishes the present matter from the statutory examples cited by CMS in its argument that our courts have not found waiver where the statutory language includes general references to the circuit court, such as the 2008 amendments to the Human Rights Act. *See Watkins*, 2012 IL App (1st) 111756 at ¶ 23; *Lynch*, 2012 IL App (4th) 111040 at ¶ 30. She argues

that the Human Rights Act specifies two potential forums in which to bring claims—a commission and the circuit court. She notes that the court in *Lynch* declined to find waiver because of the ambiguity of the language. *See Lynch*, 2012 IL App (4th) 111040 at ¶ 30 (stating that the amendments could be read as providing the option to sue in the circuit court only when the employer was not a state employer subject to sovereign immunity). She compares this to the present matter, arguing that the legislature's repeated use of "judgment" and its allowance of enforcement "as in other civil cases" clearly indicate an intent to designate the circuit court as the *only* appropriate forum, without any of the ambiguity of the Human Rights Act as discussed in *Lynch*.

¶ 50    As to CMS's reliance on *Hicks* to argue that, in the absence of specific authority creating a private right of action, private parties cannot bring an action on an official bond, Kay contends that *Hicks* is distinguishable because the plaintiffs were third parties, not named in the bond or the statute. The court held that without any consent from the State to sue the insurer directly, nothing permitted a third party to sue on the bond. *Hicks*, 97 Ill. App. 2d at 831. In the present case, Kay argues that the Act specifically states that the bond is "payable to and for the benefit of the account owners in the College Savings Pool." 15 ILCS 505/16.5(o). And when a contract exists for the direct benefit of a third party, that party is allowed to sue for breach; this extends to bonds, as contracts between the surety and obligor. *See Ardon Electric Co., Inc. v. Winterset Construction, Inc.*, 354 Ill.App.3d 28, 39 (1st Dist. 2004) (Subcontractor plaintiffs were third-party beneficiaries of a contract between municipality and general contractor, in which the general contractor agreed to obtain a surety bond pursuant to the Public Construction Bond Act to ensure payment to subcontractors); *Shaw Industries, Inc. v. Community College District No. 515*, 318 Ill.App.3d 661, 669 (1st Dist. 2000) (same).

¶ 51    Kay also rejects CMS's position that a finding of waiver in this matter would have far-reaching effects in any instance in which a public officer or employee is required by law to post a bond. She argues that the College Savings Pool bond is unique as being the only official bond that makes members of the public beneficiaries and payees of the bond. She also claims that, if it is CMS's position that there is no explicit statutory waiver of sovereign immunity that would allow her to proceed in the underlying case, then CMS cannot also argue that the Attorney General can bring suit on behalf of the Pool participants—there is no explicit waiver of sovereign immunity in the Attorney General Act. Therefore, she concludes, if sovereign immunity bars her suit, it bars the Attorney General from suing as well.

¶ 52    We begin our analysis by noting that Kay is correct in identifying that there is no one fixed phrasing by which the legislature can indicate its affirmative intent to waive sovereign immunity. Certainly, our analysis is more straightforward where the legislature has chosen to directly state, "For purposes of this Act, the State of Illinois waives sovereign immunity," as in some of the examples to which we cite above. However, that is not the only way to indicate waiver, as we have seen in the examples of the Illinois Civil Rights Act. *See Grey*, 2015 IL App (1st) 130267, ¶¶ 20-21.

¶ 53    Nevertheless, whatever the statutory language may be, we will not make a finding of waiver if it is insufficiently explicit and affirmative. Our courts have previously declined to find waiver where a statute authorized prejudgment interest on judgments against governmental entities. *See Walker*, 131 Ill.2d at 307. While the decision in *Walker* did not turn on an analysis of the word "judgment," we note that neither this decision nor any other opinion from our courts has found a waiver of sovereign immunity based on the legislature's use of language that indirectly suggests the possibility of bringing an action in circuit court pursuant to that statute. This is to be

expected, as such a finding would be contrary to the long-established caselaw on waiver, which, as we have explained, requires that the statutory language be "clear and unequivocal, explicitly indicating through affirmative language the legislature's specific authorization of waiver." *Parmar*, 2018 IL 122265 at ¶ 31. That simply cannot apply to any of Kay's statutory examples she cites in support of her position.

¶ 54    Looking at another example, we find that the language at issue here is distinguishable from the clear, definitive expression of waiver that we found in *Grey*. 2015 IL App (1st) 130267 at ¶¶ 20-21. In *Grey*¸ we determined that the legislature intended to subject the State to liability for attorney's fees and costs pursuant to section 5(c) of the Civil Rights Act. *Id*. However, there was no dispute in that case as to whether the statute allows for claims to be brought against the State at all—section 5(b) permits any aggrieved party to "bring a civil lawsuit, in a federal district court or State circuit court, against the offending unit of government." 740 ILCS 23/5(b). This only further demonstrates that when the legislature intends to allow parties to bring claims against the State in the circuit court, it says so directly. Therefore, we do not agree with Kay's position that the circuit court is implicitly mentioned as a proper venue for suits such as hers. Indeed, pursuant to the Court of Claims Act, she could have sought recovery in the court of claims instead.

¶ 55    Furthermore, Kay is incorrect in claiming that the College Savings Pool bond would be a "nullity" if we do not find that the legislature waived sovereign immunity. Sovereign immunity and the existence of a bond for the benefit of Pool participants are entirely consistent. The Attorney General is authorized to file an action on behalf of the People of the State, and can certainly do so in the circuit court. *See* 15 ILCS 205/4. The Attorney General could collect on the bond, for the benefit of Pool participants. Kay's argument that sovereign immunity would bar a suit by the Attorney General as well as suits brought by Pool participants is unfounded, as the Attorney

General brings actions on behalf of the State, which are not subject to sovereign immunity. Therefore, it is entirely possible for private individuals to be barred from filing actions on the bond, *and* for the bond to exist for the benefit of those individuals, as a source of recovery in actions brought by the Attorney General. *See also Bueker*, 2016 IL 120024 at ¶¶ 18-22 (distinguishing various historic examples of suits brought by public entities bringing suits on official bonds on behalf of injured parties.) Kay is mistaken in arguing that, if her suit is barred by sovereign immunity, then an action brought by the Attorney General would be similarly barred.

¶ 56    The abovementioned point is also relevant to Kay's arguments that the Bond Act and Payment Act indicate waiver of sovereign immunity by allowing for "judgments" from the circuit court on public bonds and by requiring the State to pay out of its funds the cost of official bonds, respectively. Such provisions are not inconsistent with the Immunity Act; they do not indicate the legislature's blanket intent to allow the public to sue on official bonds. If the legislature intended for such a far-reaching exception to the general rule of sovereign immunity, it would not be worded so cryptically as to require our courts to, for example, read "circuit court" where the legislature uses the word "judgment." It is far more likely that the legislature would have directly, plainly stated that a private right of action exists on a public bond.

¶ 57    In ruling on CMS's motion to dismiss, the circuit court acknowledged our finding in *Kay v. Frerichs* that Kay's original suit against the Treasurer sought recovery that would draw from state funds, but went on to consider whether sovereign immunity could bar a suit against the surety on the bond when the Treasurer was authorized to choose whether to use a self-insured state agency or a private third party as surety. However, the question of whether sovereign immunity would bar a hypothetical suit brought by account holders against the surety if the Treasurer had selected a

private insurer is beyond the scope of the certified question on appeal. We are asked to review the text of the Act and to determine whether it contains language waiving sovereign immunity.

¶ 58     We are also unconvinced by Kay's contention that a finding of waiver in the Bond Act would not have the unintended, far-reaching consequence of subjecting the State to liability in the numerous other instances where State officers are required by statute to post a public bond. Whether Kay is correct or not in stating that the College Savings Pool Act is unique in stating that the bond is "payable to and for the benefit of the account owners," we have explained above that this language is insufficient to affirmatively, explicitly waive sovereign immunity. Kay's only support for her position here is that the legislature declined to write that the bond is payable to "the People of the State of Illinois," language that the court in *Bueker* found insufficient to evince a legislative intent to allow private citizens to sue on the official bond. *See Bueker*, 2016 IL 120024, ¶ 17. If the General Assembly was aware of the possibly unprecedented phrasing it used in creating the Act's bond requirement, and it intended to waive sovereign immunity, it stands to reason that the General Assembly would have made this waiver explicit, rather than inferred through process of elimination by comparing the Act with other examples of statutory language that did *not* constitute waiver.

¶ 59     We emphasize again that we are not looking for one set phrase when conducting the waiver analysis. However, we have not been presented with any example of statutory language which our courts have found to be a waiver of sovereign immunity that is similar to the language of the Act. We similarly have not been presented with any authority finding either the Bond Act or the Payment Act to be a basis for the waiver of sovereign immunity in any other statute, or that implied references to recovery in the circuit court through the use of "judgment" can be construed as waiver. There were several ways in which the General Assembly could have waived sovereign

immunity to allow Pool participants to maintain an action on the official bond in the circuit court. None are present here.

¶ 60    In interpreting the Act, we are tasked with ascertaining and giving effect to the legislature's intent, without reading into the text anything that is not consistent with that legislative intent. We do not find any sort of clear, affirmative, and specific waiver of sovereign immunity in the matter at issue. Therefore, we answer the first of the circuit court's certified questions in the negative, and find that the General Assembly did not waive sovereign immunity to allow a participant in the College Savings Pool to initiate an action in the circuit court against the surety on the bond.

¶ 61                    Whether the Act Created a Private Right of Action

¶ 62    Having answered the first question in the negative, we note that we need not go further in analyzing whether Kay can maintain her suit—it is barred by sovereign immunity. However, we will address the second certified question below.

¶ 63    In denying CMS's motion to dismiss, the circuit court noted that the leading case on the standing issue is *Beuker*. In that case, our supreme court held that "[t]he proper claimant on a statutory public official bond is the named obligee, unless the legislature has expressed in the statutory language its intent to allow others to sue directly on the bond." *Beuker*, 2016 IL 120024 at ¶ 10 (discussing whether private citizens could bring an action on a public official bond mandated under the Property Tax Act). Explaining further, the *Bueker* court discussed the Supreme Court decision *Midland Loan Finance Co. v. National Surety Corp.*, 309 U.S. 165 (1940), which, in holding that a private citizen did not have standing to sue on a public official bond, wrote,

> "Whether as a matter of right a third party may sue on the instrument for loss covered by an official bond running only to the statutory obligee depends upon the intention of the legislative body which required the bond. This intention may be evidenced by express statutory language or by implication." *Midland Loan Finance Co.*, 309 U.S. at 170 (quoted in *Bueker*, 2016 IL 120024 at ¶ 11).

¶ 64    The circuit court disagreed with CMS that *Bueker* broadly held that private citizens cannot be the proper claimants on a statutorily-mandated public official bond. Rather, the court stated that it must look to the statutory language and the language of the bond, to determine whether the General Assembly expressly or implicitly indicated an intent to create a private right of action on the College Savings Pool bond. In conducting that determination, the court stated:

> "The obligee on the bond is the treasurer, but the statute says that the bond must be payable to and for the benefit of the account owners in the college savings pool. In case of a conflict between the bond and the statute, the terms of the statute control. And, in fact, *** there's not really a conflict here because the certificate of coverage for the bond says that it's provided to comply with the statutory requirements here because the statute says that the bond should be payable to and for the benefit of the account holders. And plaintiffs in this case are a class of account holders. Plaintiffs have standing to bring this suit on the bond."

¶ 65    On appeal, CMS argues that when the General Assembly established the College Savings Pool in 2000, our courts had already interpreted the Bond Act as not authorizing a private right of action, based on the common-law rule that private parties could not sue on an official bond absent specific authority. *See Hicks*, 97 Ill. App. 3d at 831. It further states that in the absence of clear language stating that Pool participants may sue to collect on the bond, we cannot read a private right of action into the Act. Kay broadly argues that the Pool participants have standing to bring an action on the bond because the Act makes them the named obligees—or at least intended beneficiaries—on that bond. *See Shaw Industries*, 318 Ill.App.3d at 669 (subcontractor had standing as third-party beneficiary to pursue breach of contract claim under the Public Construction Bond Act).

¶ 66    As in our review of the sovereign immunity question, there is no set phrase that the General Assembly must use to create a private right of action, and there are various examples of statutory language that our courts have found to authorize or not authorize a private right of action. In our review of the Act, we presume that the General Assembly was aware of the relevant existing

statutes and caselaw, and, based on that knowledge, knew how to include language allowing private parties to sue directly on the bond. *See Bueker*, 2016 IL 120024 at ¶ 24 ("The legislature clearly knows how to include language allowing private citizens to bring claims directly for their own use and benefit.")

¶ 67 Our prior discussion of *Bueker* is relevant here as well. In *Beuker*, our supreme court held that the legislature did not allow private citizens to bring direct actions on the official bond by naming "the People of the State of Illinois" as obligee on the public bond in section 3–10003 of the Counties Code and section 19–40 of the Property Tax Code. *Id.* In doing so, the supreme court contrasted these sections with a different section of the Property Tax Code, section 20–155, which "specifically provides that 'persons aggrieved, may prosecute suit against any collector *** by suit upon the bond, in the name of the People of the State of Illinois, for their use,' but only when the collector's breach involves the failure to make the reports and payments required by the Property Tax Code." *Id.* (quoting 35 ILCS 200/20–155 (West 2014)). Therefore, the court concluded, the legislature intentionally circumscribed the situations in which private individuals could bring direct actions on statutory official bonds, and the plaintiffs' claims did not fall within such circumstances. *Id.*

¶ 68 CMS further contends that Kay's argument that individual Pool participants are necessarily the obligees on the bond is not supported by the plain language of the Act, and that the General Assembly would have specified as such had this been the intent—just as it would have specified that private individuals may sue to collect on the bond. Again discussing *Bueker*, CMS notes that the relevant section of the Counties Code stated that the County treasurer must post a bond that substantively follows a form that includes language that the principal and surety "are obligated to the People of the State of Illinois." *Id.* at ¶ 14 (quoting 55 ILCS 5/3–10003 (West 2014)). The Act

here states that the bond is "payable to and for the benefit of the account owners" 15 ILCS 505/16.5(o). On this point, CMS concludes that this does not rise to the level of providing specific authority for private actors to sue on an official bond; while "it is usually provided that bonds given by officers to States and counties shall be available to protect the interests of private persons who may be aggrieved by the breach of such bonds," such bonds cannot be used "for these purposes in cases unprovided for by such statutory enactment." *Hicks*, 97 Ill. App. 3d at 831 (quoting *City of Eaton Rapids for use of Snyder v. Stump*, 86 N.W. 438, 439 (Mich. 1901)).

¶ 69    Kay argues that if section 16.5(o) does not create a private right of action, then the provision that the bond shall be "payable to and for the benefit of the account owners" is meaningless. CMS's position is that the legislature may indicate that an official bond is created for the use of certain parties for whose benefit a public body may bring actions to collect on the bond. As discussed in the previous section, the Attorney General or other public representative of the People may bring an action on behalf of the private parties. *See Bueker*, 2016 IL 120024 at ¶ 19.

¶ 70    CMS also argues that the General Assembly did not authorize actions such as Kay's, brought by a class of plaintiffs representing only a set of Pool participants, as this would run counter to its intent that the bond be payable to and for the benefit of all account owners in the Pool. It contends that if individual account holders could bring actions on the bond, the bond would be depleted, leaving any other account holders with valid claims on the bond without recourse. Additionally, in her putative class action suit, Kay attempts to represent only a subset of Pool participants, and any recovery on the bond would only go to that subset, not account holders as a whole. Not only would judgment in her favor exclude Pool participants who are not part of the putative class, but it could also result in bond funds going to individuals who are not Pool

participants, because she seeks attorney fees from the bond. This, CMS concludes, is counter to the legislature's intent in establishing a bond for the benefit of Pool account owners.

¶ 71 Kay responds by again emphasizing her position that Pool participants are the named obligees of the bond, and that it is the individual account holders, not the State, who have an interest in the bond. She claims that there is no state money in the Pool; it is entirely comprised of money paid by the participants. Therefore, she contends that the participants have standing to recover that money directly, and do not need to rely on the Attorney General to choose to bring an action on their behalf. She further argues that the Attorney General lacks the authority to bring such an action, because the Attorney General Act only permits suits brought "in favor of or for the use of the State," and the State has no interest in the contributions deposited into the Pool. *See* 15 ILCS 205/4, 15 ILCS 505/16.5(c).

¶ 72 Regarding CMS's argument that judgment in favor of Kay and a class representing a subset of Pool participants, she responds that there is no requirement that every beneficiary must be harmed in order for bond coverage to exist, and that individual participants are permitted to vindicate their rights. She further claims that it is unclear whether the bond could be depleted because the $10 million penal sum indicated in the Act only serves as a cap on any given action, and it is possible that the bond would be considered replenished after CMS paid the claim. Additionally, she argues that she only might be entitled to attorney fees, and it is not yet known whether any non-Pool-participants would be entitled to fees.

¶ 73 We agree with CMS that we must presume the General Assembly was aware of the relevant caselaw finding the creation of a private right of action (or lack thereof) in prior statutory language creating official bond requirements. Even if Kay is correct in her assertion that the language in the Act stating that the bond be "payable to and for the benefit of the account owners" is unique to the

Act, it does not follow that this allows account owners to sue on the bond, particularly when we consider that the legislature drafted this provision with full knowledge of how to make such an intent clear. As noted in *Hicks*, the general rule is that private parties cannot collect on public official bonds. If the legislature intended to provide an exception here, it would have made this clear.

¶ 74   Kay urges us to apply the law of suretyship and infer that Pool participants are named as obligees on the bond, and may therefore bring an action on the bond. She distinguishes *Bueker* in stating that the named obligee on the bond at issue in that case was "the People of the State of Illinois," which our supreme court explained refers to the body politic, rather than to private citizens. *See Bueker*, 2016 IL 120024 at ¶ 17. While we acknowledge the difference between the obligee in *Bueker* and the reference to account owners in the Act here, we disagree that this necessitates the conclusion that section 16.5(o) created a private right of action. Furthermore, Kay's citations to cases finding that unnamed third-party beneficiaries had standing to sue on a bond do not reach the issue here—in order for her to maintain her suit, the legislature must have specifically created a private right of action to sue on the public bond. Additionally, Kay relies on authority discussing contractual bonds that are not subject to the rule that private parties cannot sue on public official bonds without specific authority. *See, e.g., City of Elgin v. Arch Insurance Co.*, 2015 IL App (2d) 150013; *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252 (1931); *see also Shaw Industries*, 318 Ill.App.3d 661 (subcontractor filed a breach of contract action against contractor for failure to post a bond pursuant the Public Construction Bond Act, which expressly permits subcontractors to sue on the statutory bond).

¶ 75   Following the rules of statutory interpretation, we are not convinced that the legislature intended to create a private right of action if, in order to comprehend this intent, we must first read

"payable to and for the benefit of" to mean "obligees," and then apply the law of suretyship to arrive at the conclusion that the individual Pool participants are permitted to directly sue on the bond. These inferences and departures from the text are precisely what we must avoid in construing a statute.

¶ 76    Furthermore, for the same reasons stated in our discussion of the sovereign immunity question, we agree with CMS that we need not find a private right of action in the Act in order to give meaning to the legislature's statement that the Pool bond is payable to and for the benefit of account holders. The Attorney General may sue on the bond for the benefit of Pool participants, or individual participants may bring actions in the Court of Claims. We have already addressed Kay's attempt to show that, based on CMS's own argument, the Attorney General would be barred by sovereign immunity, but she now adds the argument that the Attorney General can only bring actions "in favor of or for the use of the State," and the Pool bond is for Pool participants, not the State. *See* 15 ILCS 205/4. For the same reasons as those we discuss below, addressing her claim that the legislature drafted the Act's bond requirement in a novel and unprecedented manner that bypasses the State and allows individual account holders to sue directly, we are not convinced by her making the same distinction here. Here, we need not address this argument further, as it goes beyond the certified question at issue. Similarly, we need not make a determination on the parties' argument of whether Kay's proposed suit would deplete the bond, thwart the purpose of the bond, or result in recovery on the bond by attorneys who are not participants in the Pool.

¶ 77    Kay attempts to present the language of the Act as unique and unprecedented—that if the legislature intended to make the State the obligee of the bond, it would have used the same language used in prior statutes instead of referring to account owners in the Pool. Kay's argument is unconvincing, because this is not the first and only example of a public official bond that the

legislature created to protect the interests of private parties. *See, e.g., Hicks*, 97 Ill. App. 3d at 831 (stating that the primary objective of an official bond is to protect the interests of the named beneficiary, "the State, county, corporation, etc., as the case may be," but "it is usually provided that bonds given by officers to States and counties shall be available to protect the interests of private persons who may be aggrieved by the breach of such bonds") (quoting *City of Eaton Rapids for use of Snyder v. Stump*, 86 N.W. 438, 439 (Mich. 1901)). It does not follow that such private parties have standing to bring an action on the official bond at issue, without specific authority from the legislature. *Id.*

¶ 78    Kay's repeated emphasis on the novel language used in the Act to create the Pool bond merely obscures the fact that there is no specific, clear language either expressly or impliedly indicating the legislature's intent to create a private right of action that would give her standing to pursue her claims. Indeed, if the legislature *did* truly do something it had never done before with an official bond, as Kay claims, we still presume that it did so with the same knowledge of the relevant existing statutory language and caselaw. The legislature would have been aware of the lack of precedent for what it was doing in creating the Pool bond. It would have been further aware that it was creating an exception to the common-law rule that private parties lack standing to collect on public official bonds. *See McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 30 ("A legislative intent to alter or abrogate the common law must be plainly and clearly stated.") It is reasonable to conclude, therefore, that the legislature would have been especially careful in drafting the Act to make it explicitly clear that it was creating a private right of action authorizing account holders to individually sue on the bond. As demonstrated by the parties' significant debate on this question before us and the circuit court, such authorization, if it existed, would be far from

clear. Furthermore, the rules of statutory interpretation do not permit us to read such authorization into the Act.

¶ 79   Therefore, we answer the second certified question in the negative, and find that the Act did not create a private right of action allowing individual Pool participants to have standing to pursue an action to recover from the bond.

¶ 80                                  CONCLUSION

¶ 81   For the foregoing reasons, we answer both certified questions in the negative. The Illinois General Assembly did not waive sovereign immunity to allow a participant in the College Savings Pool to initiate an action in the circuit court against the surety on the bond posted pursuant to section 16.5(o) of the College Savings Pool Act, 15 ILCS 505/16.5(o). The College Savings Pool Act did not create a private right of action allowing individual participants in the College Savings Pool to have standing to pursue an action to recover from the bond.

¶ 82   Certified questions answered; cause remanded.